659 P.2d 1279

**John E. SMITH and Mary Lou Smith, his wife, Plaintiffs/Appellants,**

v.

**MELSON, INC., an Arizona corporation; Joseph Fallini, the State Land Commissioner; and Arizona State Land Department, an Agency of the State of Arizona, Defendants/Appellees.**

**No. 2 CA–CIV 4107.**

Court of Appeals of Arizona, Division 2.

April 16, 1982.

Review Granted June 22, 1982.

Ellis & Baker, P.C. by William D. Baker and Robert S. Porter, Phoenix, for plaintiffs/appellants.

Black, Robertshaw, Frederick, Copple & Wright, P.C. by Frederick O. Robertshaw, Phoenix, for defendant/appellee Melson.

Robert K. Corbin, Atty. Gen. by Kathy W. Rand, Asst. Atty. Gen., Phoenix, for defendants/appellees Fallini and State Land Dept.

## OPINION

HATHAWAY, Judge.

The issue in this appeal is the proper interpretation of a contract for the purchase of realty.

Appellants (the Smiths) negotiated to buy a ranch from Lazy V–P Ranches, Inc. About 600 acres of this ranch was the subject of negotiations for a land exchange between Lazy V–P and the state land department. The Smiths were told of this proposed exchange but offered to buy the ranch nevertheless. The sale was dealt with in two separate agreements. The first was for the purchase of the bulk of the ranch and is not in dispute. The second, labeled "Range and Pasturing Agreement," provided pasturing and watering rights for the Smiths' cattle while the Smiths were paying off the note and mortgage on the ranch. The disputed provisions of this

Range and Pasturing Agreement[1] are: (1) A recital that Lazy V–P intended to dispose of the 600-acre tract; (2) the provision, "If Title is acquired to these 600 acres by the State of Arizona," then Lazy V–P would ensure that the Smiths obtained a grazing lease from the state on the 600 acres and (3) the provision, "If the Exchange with the State of Arizona for the 600 acres, more or less, of Patented land is not approved, or for any reason fails or is withdrawn, then Lazy V–P Ranches, Inc., agrees to sell to Mr. and Mrs. Smith and Mr. and Mrs. Smith agree to purchase said 600 acres of land, more or less, at a price of $24,000 .... " The price in the original document was $240,000 and the terminology merely gave the Smiths a "first right of refusal." Smith himself requested the changes, which were agreed to because an exchange was contemplated "some way or another," according to an officer of Melson, Inc. (Lazy V–P's successor in interest).

At the time of these negotiations, there was a proposal before the land department for a transfer of fee simple title to the 600 acres in exchange for fee simple title to certain state lands. This proposal, designated "application 61–14," was amended twice and finally rejected by the state. A petition for rehearing was denied and Melson, Inc. filed an appeal. At this point, the Smiths demanded performance of the agreement. The land commissioner then granted a rehearing, Melson, Inc. withdrew its appeal and a "Decision and Order of Exchange" was issued in which Melson, Inc. gave the 600 acres to the state and the state gave Melson, Inc. a one-year grazing lease.

The Smiths sued for specific performance, claiming that the exchange had failed because application 61–14 was rejected and that this failure satisfied the condition precedent to the Smiths' right to purchase the 600 acres. They also took an appeal to the superior court from the land department's order of exchange. These actions were consolidated, but the parties stipulated to a dismissal of the administrative review action. The remaining contract action was decided against the Smiths on findings of fact.

The trial court's express legal conclusions included the following:

1. The contract was not ambiguous;

2. The term "the Exchange" referred to any exchange between Melson, Inc. and the state involving the 600 acres;

3. The express purpose of the agreement was to provide the Smiths with grazing rights; and

4. The order of exchange eliminated the Smiths' "option right" to buy the acreage.

The Smiths believe these conclusions ignore the circumstances of the formation of the contract, give effect only to a portion of the contract and define "the Exchange" incorrectly.

The argument that the findings "give no meaning at all" to the term "the Exchange with the State of Arizona" is without merit in light of the conclusions, paraphrased above, that address this term and give it the logical meaning of any exchange with the state involving the described acreage.

The argument that the court ignored the circumstances of the agreement and therefore failed to find that it contemplated a purchase by the Smiths is also without merit. Although the court found that the "express purpose of the Range and Pasturing Agreement is to provide grazing rights," it also found that the exchange with the state "eliminated plaintiffs' option right under the ... Agreement." This is an obvious recognition that the Smiths had a right to buy the property but that the exchange defeated this right.

The real issue in this appeal is the interpretation of the phrase "the Exchange." The Smiths contend that parol evidence proved that the term was meant to refer only to the proposals contained in application 61–14 and its amendments. The appellees claim that no parol evidence should be considered to define the term because it is unambiguous and that the proper definition is *any* exchange with the state involving the 600 acres.

1. The agreement is set out in its entirety in the dissent.

We begin our consideration of the question by first comparing *Richards Development Company v. Sligh,* 89 Ariz. 100, 102, 358 P.2d 329, 330 (1961) ("parol evidence is not admissible to aid in the interpretation of the parties' intentions until the four corners of the writing itself have been searched to determine whether the document itself affords a reasonably clear understanding of what the parties have agreed to do.") with *McCormack v. Kirtley,* 115 Ariz. 25, 29, 563 P.2d 280, 284 (1977) ("[t]he circumstances under which a writing was made may always be shown," quoting Williston). The intricacies of the parol evidence rule are considered generally in 9 Wigmore, Evidence, § 2400 (Chadbourn rev. 1981). It is unnecessary to inquire into the niceties of the rule here, however, because the instant case deals with the interpretation of the language of a contract, a situation in which parol evidence is universally allowed. *See* 9 Wigmore, supra, § 2472; J. Murray, Contracts, § 108 (1974); 3 Corbin, Contracts, § 579 at 412–21 (1960):

> "The 'parol evidence rule' is not, and does not purport to be, a rule of interpretation or a rule as to the admission of evidence for the purpose of interpretation. Even if a written document has been assented to as the complete and accurate integration of the terms of a contract, it must still be interpreted; and all those factors that are of assistance in this process may be proved by oral testimony.
> It is true that the language of some agreements has been believed to be so plain and clear that the court needs no assistance in interpreting. Even in these cases, however, it will be found that the court has had the aid of parol evidence of the surrounding circumstances. The meaning to be discovered and applied is that which each party had reason to know would be given to the words by the other party. Antecedent and surrounding factors that throw light upon this question may be proved by any kind of relevant evidence.
> The more bizarre and unusual an asserted interpretation is, the more convincing must be the testimony that supports it.

Just when the court should quit listening to testimony that white is black and that a dollar is fifty cents is a matter for sound judicial discretion and common sense. Even these things may be true for some purposes. As long as the court is aware that there may be doubt and ambiguity and uncertainty in the meaning and application of agreed language, it will welcome testimony as to antecedent agreements, communications, and other factors that may help to decide the issue."

■ In the instant case, the trial court received extrinsic evidence to prove that "the Exchange" referred to the exact proposals found in application 61–14 but the court disbelieved the suggested inference.

> "A question of interpretation of an integrated agreement is to be determined by the trier of fact if it depends on the credibility of extrinsic evidence or on a choice among reasonable inferences to be drawn from extrinsic evidence." Restatement (Second) Contracts, § 212.

The writing itself is the most important evidence of intention. *Id.,* comment b. Application 61–14 is never mentioned in the agreement. The only reference is to "the Exchange with the State of Arizona for the 600 acres, more or less, of Patented land." In addition, the contract states, "Lazy V–P Ranches, Inc. contemplates disposing of this 600 acres, more or less, of Patented lands before the said note and mortgage are fully paid and/or satisfied." We believe this language clearly supports the trial court's conclusion that "the Exchange" means *any* exchange with the state involving the 600 acres and that the contract does not deprive Melson of the right to negotiate an exchange with the state with terms different than those contained in application 61–14. It is not outweighed as a matter of law by the mere existence of application 61–14.

■ The Smiths also contend that their interpretation is correct because the transaction involving the acreage was not an exchange of any sort. They argue that it was not a statutory exchange because it

was not made pursuant to A.R.S. §§ 37–601 to –611, the article entitled, "Exchange of Public Lands." These statutes deal only with exchanges of land for land and therefore do not apply here. The transaction was made pursuant to A.R.S. § 37–104, which allows the land department to accept conveyances "by gift, in trust, or otherwise." Furthermore, the Range and Pasturing Agreement did not require an exchange specifically under A.R.S. §§ 37–601 to –611. The final argument on this point is that an exchange at common law is a transfer of equal interests only—a fee simple for a fee simple, for example. Two cases are cited.[2] We agree with the more modern definition of "exchange" as "a reciprocal transfer of property for other property of value, rather than for a money consideration," 30 Am.Jur.2d, Exchange of Property, § 1, and believe that this transaction qualifies as an "exchange."

Because of our holding, it is unnecessary to consider the other issues raised in the briefs.

Affirmed.

BIRDSALL, J., concurs.

HOWARD, Chief Judge, dissenting.

Prior to November 1972, Lazy V–P Ranches, Inc., the predecessor in interest to Melson, owned what is known as the Willow Springs Ranch. This was an extremely large holding, extending from the San Pedro River on the east, to and across U.S. Highway 60 (the Tucson-Florence highway) on the west, from Oracle Road on the south, north for approximately seven miles. This ranch contained both patented lands and lands leased from the State of Arizona.

In October 1972, Smith expressed an interest in purchasing the east end of the Willow Springs Ranch. He was shown the property which included approximately 600 acres of patented land along the San Pedro River.

In November, Lazy V–P applied to the state land department to exchange 5,000 acres of patented land for 5,000 acres of state land. This application was given No. 61–14. The 5,000 acres of patented land offered by Lazy V–P included the 600 acres which are in dispute here. These 600 acres are located along and in the bed of the San Pedro River and are, and were, an integral part of the operation of the east end of the ranch.

In December the Smiths looked at the land again, including the 600 acres and offered to purchase the property. During the negotiations between Smith and Lazy V–P, Smith was informed of the exchange application and was assured by Lazy V–P that if the exchange went through, Smith would get state leases to the 600 acres, and if the exchange did not go through, Smith would be sold the 600 acres for $25,000.

The parties entered into a sales transaction whereby Smith bought the east end of the ranch, excluding the 600 acres, for $400,000. They also entered into a "Range and Pasturing Agreement." Since the language of this agreement is crucial to the decision of this case I set it out fully:

"This Agreement made and entered into this 15th day of January, 1973, by and between Lazy V–P Ranches, Inc., an Arizona Corporation, and John E. and Mary Lou Smith, husband and wife.

WITNESSETH:

WHEREAS, on the 15th day of January, 1973, Lazy V–P Ranches, Inc., as Seller, entered into an Escrow, being Escrow No. 06016596–0, Transamerica Title Insurance Company, Phoenix, Arizona, with John E. and Mary Lou Smith, husband and wife, as Buyers, for the purchase of what is known as the East End of the Willow Springs Ranch located near Oracle, Arizona, and

WHEREAS, the parties wish to establish certain continuing range and pasturing rights during the term of the note and mortgage which is the security for

**2.** *Finke v. Boyer,* 331 Mo. 1242, 56 S.W.2d 372 (1932); *Liberto v. Sanders,* 248 S.W. 120 (Tex. Civ.App.1922), rev., 259 S.W. 1080 (1924).

the unpaid balance of the purchase price in said Escrow No. 06016596–0, said note and mortgage not being fully due until 1980.

NOW, THEREFORE, for and in consideration of the terms, covenants and conditions contained in the said Escrow Instructions, which Instructions are a binding contract by and between the parties hereto, and for and in consideration of the mutual promises, covenants and conditions herein contained, it is mutually agreed as follows: [emphasis in original]

1. During the term of the said note and mortgage from John E. and Mary Lou Smith to Lazy V–P Ranches, Inc., the said John E. and Mary Lou Smith shall continue to have grazing rights on the remaining six hundred (600) acres of Patented land owned by Lazy V–P Ranches, Inc., said lands being located in Townships 7 and 8 S, Range 16 E, GSRB & M, Arizona, along the San Pedro River and within the current fence lines of the Willow Springs Ranch. Lazy V–P Ranches, Inc., contemplates disposing of this 600 acres, more or less, of Patented lands before the said note and mortgage are fully paid and/or satisfied. If Title is acquired to these 600 acres by the State of Arizona, Lazy V–P Ranches, Inc., agrees to exercise its preferential right to lease these lands, if any, and thereafter to assign the State Lease, or Leases, to Mr. & Mrs. Smith, without additional compensation. If, because they hold the adjoining State Leases, Mr. & Mrs. Smith have a better and prior right to lease these lands, Lazy V–P Ranches, Inc., agrees to assist Mr. & Mrs. Smith in any way possible to facilitate Mr. & Mrs. Smith's acquisition of these State Leases. If the Exchange with the State of Arizona for the 600 acres, more or less, of Patented land is not approved, or for any reason fails or is withdrawn, then Lazy V–P Ranches, Inc., agrees to sell to Mr. & Mrs. Smith and Mr. & Mrs. Smith agree to purchase the said 600 acres of land, more or less, at a price of $24,000.00, said price to include all improvements together with waters, water rights and other appurtenances to the said 600 acres.

If the Exchange with the State of Arizona is not consummated at the time the purchase price under said Escrow No. 06016596–0 is paid in full, then Lazy V–P Ranches, Inc., will sell and Mr. & Mrs. Smith will buy the said 600 acres, more or less, at a price of $24,000.00, said price to include all improvements, waters, water rights and appurtenances thereto to the said 600 acres. The terms of this sale shall be 28% down in cash and the balance in seven equal annual installments, together with 7% per annum interest in addition to principal.

2. Lazy V–P Ranches, Inc., shall continue to have stock-watering rights from the Tunnel Spring and Well located in the E½ of Section 3, Township 8 S, Range 15 E, the said Tunnel Spring and Well being part of the State leased lands being assigned by Lazy V–P Ranches, Inc., to John E. and Mary Lou Smith. This right shall continue until the said note and mortgage are fully paid and satisfied.

3. John E. and Mary Lou Smith shall have stockwatering rights from the Cowhead waters located in the W½SW¼ of Section 23, Township 7 S, Range 15 E, which waters are necessary to effectively graze some of the lands being purchased by Mr. & Mrs. Smith from Lazy V–P Ranches, Inc. This right shall continue until the said note and mortgage are fully paid and satisfied.

The aforementioned Tunnel Spring and Well and the Cowhead waters are located on State lands, but it is the intention of the parties hereto to allow the continued use of water for stockwatering purposes from these wells, springs and waters as set forth in paragraphs 2 and 3 next above despite the fact that they may be a part of the lands being assigned under the said Escrow.

This Agreement shall be binding on the heirs, executors, administrators and assigns of the parties hereto." (Emphasis added)

This agreement was amended in 1974 to provide for a more accurate description of

the 600 acres. In 1975, the Arizona State Land Department was notified of the existence of the agreement and the amended legal description.

After filing the exchange application in 1972, Lazy V–P, and its successor, Melson, amended the application several times, always decreasing the acreage involved, but always keeping the 600 acres in the amended applications. In the seventh year after filing, on February 23, 1979, the state land commissioner entered his order rejecting application 61–14 and all amendments thereto. He further entered an order re-classifying the state land described in 61–14, thus leaving no identifiable state lands available for the proposed exchange.

Melson sought a rehearing of the order denying the exchange which was denied on February 23, 1979, and on April 9, 1979, Melson filed notices of appeal of both the order denying the exchange and the order denying the petition for rehearing. Melson did nothing further to perfect the appeals of these orders. He did not file a notice of appeal of the order re-classifying the state land.

On April 20, 1979, Smith tendered to Melson escrow instructions and demanded performance of the land sale contract contained in the agreement. This tender was refused by Melson. Five days later, Melson delivered a letter to the state land department proposing the transfer to the state of the title to the 600 acres and receiving in return a four-year extension on the term of an existing state lease held by Melson. This proposal was not acceptable to the state.

The next day, Melson submitted another proposal to the state land department. In this proposal, he offered to deed the state the 600 acres in return for a one-year's rental credit on two existing grazing leases held by Melson and a new ten-year grazing lease on an unidentified section of state land. This letter was not considered by the state land department to be an amendment of application of 61–14. However, it triggered negotiations between the state and Melson, which resulted in the state accepting a proposal whereby it agreed to accept the 600 acres in exchange for a one-year, rent-free extension of a grazing lease. Melson also agreed to dismiss his notices of appeal.

I believe that the majority has engaged in an unwarranted re-writing of the contract rather than merely interpreting it. At the time this agreement was entered into, the parties knew that application 61–14 was pending before the state land department. The agreement uses the word "the Exchange." It also states that, "If the Exchange with the State of Arizona for the 600 acres, more or less, of Patented land is not approved, or for any reason fails or is withdrawn . . ." Lazy V–P Ranches, Inc., agrees to sell the land to the Smiths. It is clear to me that what is referred to in the agreement is the pending exchange application 61–14. The trial court and the majority have re-written this agreement to read: "*any* exchange" instead of "the Exchange" even though the majority apparently agrees with the trial court in its conclusion that the contract is unambiguous. It is also clear that the parties agreed that if application 61–14 or any amendments thereto did not result in an exchange of land, the Smiths were entitled to purchase it. The majority interprets the contract to read that if *any* exchange takes place, then the right to purchase the acreage is lost. If the parties had meant "any exchange" they could have easily said so.

I would reverse and remand the case with instructions to enter a judgment granting Smiths' specific performance of the land sales contract embodied in the range and pasturing agreement.